UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **POLYONE CORPORATION** | ) | |
| 33587 Walker Road | ) | |
| Avon Lake, OH  44012 | ) | |
| | ) | CASE NO.  1:13-cv-02717 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| **JOSEPH KUTKA** | ) | **JURY TRIAL DEMANDED** |
| 460 Smythe Drive | ) | |
| Williams Bay, WI 53191 | ) | |
| | ) | |
| **YUN MARTIN LU** | ) | |
| 19 Cambridge Lane | ) | |
| Lincolnshire, IL 60069 | ) | |
| | ) | |
| **THOMAS CASTILE** | ) | |
| 1865 Hollyhock Lane | ) | |
| Elm Grove, WI 53122 | ) | |
| | ) | **FIRST AMENDED COMPLAINT** |
| **TIE-LIANG "TYLER" XU** | ) | **FOR PRELIMINARY** |
| 1860 Lancaster Lane | ) | **INJUNCTION, PERMANENT** |
| Woodridge, IL 60517 | ) | **INJUNCTION, AND DAMAGES** |
| | ) | |
| **POLYMAX THERMOPLASTIC** | ) | |
| **ELASTOMERS LLC** | ) | |
| 3210 Oak Grove Avenue | ) | |
| Waukegan, IL 60087 | ) | |
| | ) | |
| **NANTONG POLYMAX ELASTOMER** | ) | |
| **TECHNOLOGY CO., LTD** | ) | |
| No. 698 Changtai Road, Gangzha | ) | |
| 226011 Nantong Jiangsu | ) | |
| China | ) | |
| | ) | |
| Defendants. | | |

Plaintiff PolyOne Corporation ("PolyOne") brings this action against Joseph Kutka, Yun Martin Lu, Thomas Castile, Tie-Liang "Tyler" Xu, PolyMax Thermoplastic Elastomers LLC ("PolyMax"), and Nantong PolyMax Elastomer Technology Co., Ltd. ("PolyMax Nantong"), and alleges as follows:

## **INTRODUCTION**

1.      This matter involves a conspiracy among several individuals and companies to defraud PolyOne Corporation ("PolyOne"), headquartered in Avon Lake, Ohio, of the honest services of one of its key employees, to tortiously interfere with the key employee's contractual obligations and duty of loyalty to PolyOne, to steal and usurp customers and business opportunities belonging to PolyOne, to misappropriate trade secrets and confidential information belonging to PolyOne, and to otherwise unfairly compete with PolyOne through theft and other artifices as part of an overall scheme to establish manufacturing and research and development facilities and marketing and sales operations of a Chinese competitor in the United States.

2.      PolyOne is one of the world's leading providers of specialized polymer materials, services, and solutions.  It is an integrated company, offering many families of materials to help solve the demanding application needs of its customers.  Each of its divisions works closely with the others in sharing technology, know-how, and marketing experience and opportunities. Among its divisions are its Geon Performance Materials division, which specializes in manufacturing vinyl resins and compounds, and its GLS division, which specializes in manufacturing and compounding thermoplastic elastomers ("TPEs").  PolyOne merged with GLS in 2008.  (In this amended complaint, GLS will be referred to as "PolyOne GLS" or "PolyOne").

2

3.      PolyOne GLS manufactures TPEs, which are a type of soft plastics.  TPEs are used in a wide variety of applications and sold to a diverse customer base.  TPEs are used in grips, such as on toothbrushes or hammers; synthetic corks, which are used in wine bottles; and cap liners, which are used on the inside of a lid to a plastic bottle to "seal" the bottle correctly.  Some of the TPE formulas are "stock" formulas that are sold to many different customers while others are created especially for particular customers.  All of PolyOne's TPE formulations are closely-guarded trade secrets.

4.      Defendants Kutka, Lu, and Castile are all former employees of PolyOne GLS.  Yun Martin Lu is a Chinese-born American citizen who worked at PolyOne GLS as a top scientist.  While at GLS, Lu was employed as a formulator, whose job was to develop and test TPE formulations for PolyOne and its customers.  Lu became one of the principals who started PolyMax Nantong in 2005 and later PolyMax in the United States.  He is currently one of the owners of both PolyMax entities and functions as the chief scientist, president and CEO of both companies.

5.      Thomas Castile is a former employee of PolyOne GLS, and was employed as part of PolyOne GLS's sales and marketing group, rising to the level of key accounts manager, managing strategic accounts for the company, many of which are still PolyOne customers.  Through his work at PolyOne GLS, Castile was aware of the pricing, costs, and margins of PolyOne GLS, which are considered confidential and trade secrets.  Though formally employed with another company between his time at PolyOne GLS and PolyMax, Castile began to simultaneously work for PolyMax "on a handshake" in 2011.  He later in May or June 2013 left his employment with the other company and became an employee and part owner of PolyMax, at which he has called on key PolyOne GLS customers on behalf of PolyMax.

6.      Joseph Kutka was employed by PolyOne and its predecessor, GLS, for nearly twenty years, starting work at GLS in 1994.  During the course of his career, Kutka worked in some of the most sensitive and key areas of the company, eventually in management and key research and development roles.  A chemist and MBA by education, Kutka also worked in sales and marketing at PolyOne GLS and held the titles of Technology Launch Manager and Market and Business Development Manager.  He secretly began working for PolyMax in the United States in 2010, while still fully employed by PolyOne.  His clandestine work for PolyMax continued until Kutka left PolyOne in November of 2013, and was not discovered by PolyOne until expedited discovery in the present case.

7.      The Defendants' conspiracy came complete with secret meetings, conversations on cell phones belonging to other people in order to disguise records of conversations, Skype accounts, the downloading of thousands upon thousands of files consisting of PolyOne's confidential and trade secret information, and Kutka's destruction of documents and emails evidencing the conspiracy.  Absent judicial intervention, the Defendants will continue to cause PolyOne untold and incalculable damage through the theft of its trade secrets and conspiracy to unfairly steal its business.

## THE PARTIES

8.      Plaintiff PolyOne is an Ohio corporation with its principal place of business at 33587 Walker Road, Avon Lake, OH 44012.

9.      Defendant PolyMax Nantong is a Nantong, China-based manufacturer and compounder of thermoplastic elastomers.  Among the principals of PolyMax Nantong are Defendants Lu and Xu.

4

10.     Defendant PolyMax is an American subsidiary or sister company of PolyMax Nantong, and was formed in 2013, with at least some of the same investors as PolyMax Nantong. PolyMax is a U.S.-based manufacturer of TPEs, and competes directly with PolyOne for the sale of TPEs.  Defendants Xu, Lu, and Castile are among the principals of PolyMax and Kutka has agreed to purchase a three percent interest in PolyMax in order to become a co-owner of a venture directly competitive with PolyOne.

11.     Defendant Kutka, upon information and belief, is a citizen of the State of Wisconsin and is a resident of Walworth County.  As noted below, Kutka's Employee Agreement with PolyOne provides that jurisdiction and venue for violations of the Agreement will be in the "state and federal courts located in Cleveland, Ohio."

12.     Defendant Lu is a Chinese-born U.S. citizen who, upon information and belief, is a citizen of the state of Illinois.  Lu is a former GLS employee who, in 2005, co-founded PolyMax Nantong, a China based polymer manufacturer that is competitive with PolyOne in both China and the United States.  In 2013, Lu co-founded PolyMax, an Illinois-based TPE manufacturer and compounder, and direct competitor of PolyOne.

13.     Defendant Thomas Castile, upon information and belief, is a citizen of the state of Wisconsin.  Castile, a former PolyOne GLS employee, is a co-owner and employee of PolyMax.

14.     Defendant Tieliang "Tyler" Xu, upon information and belief, is a Chinese-born American citizen, who is a citizen of the state of Illinois.  Xu is an investor and co-owner of PolyMax Nantong and PolyMax.

## JURISDICTION AND VENUE

15.     The Court has personal jurisdiction over Kutka because paragraph 25 of the parties' Employee Agreement (the "Agreement"), a true and correct copy of which is attached

5

hereto as Exhibit A, provides that "the state and federal courts located in Cleveland, Ohio shall have exclusive jurisdiction in any action arising out of this Agreement."

16.     The Court has personal jurisdiction over Defendants Lu, Castile, Xu, PolyMax Nantong, and PolyMax, *inter alia*, pursuant to Ohio's long-arm statute, because those Defendants, or their agents: (1) transact business in Ohio; (2) contract to supply goods or services in Ohio; (3) conspired to cause tortious injury by an act or omission in Ohio; (4) conspired to cause tortious injury in Ohio by an act or omission in Ohio and regularly does or solicits business, or engages in other persistent courses of conduct, or derives substantial revenue from goods used or consumed or services rendered in Ohio; (5) caused tortious injury in Ohio by an act outside this state committed with the purpose of injuring persons, when he or it might reasonably have expected that some person would be injured thereby in this state; (6) caused tortious injury by a criminal act, any element of which takes place in Ohio, which he committed or in the commission of which he or it was guilty of complicity; and/or (7) the above Defendants were part of a conspiracy with Kutka in which the effect on a citizen of Ohio was a direct and foreseeable result of conduct in furtherance of the conspiracy.

17.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states.  Upon information and belief, the amount in controversy exceeds $75,000.  The Court additionally has jurisdiction pursuant to 28 U.S.C. § 1331.

18.     Venue is proper in this Court over Defendant Kutka because paragraph 25 of the Employee Agreement, a true and correct copy of which is attached hereto as Exhibit A, provides that "the state and federal courts located in Cleveland, Ohio shall have exclusive jurisdiction in any action arising out of this Agreement."  Venue is proper as to all Defendants pursuant to 28

U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this litigation occurred within the district.

## FACTUAL BACKGROUND

### *Kutka's Employee Agreement With PolyOne*

19.     Upon the acquisition of GLS by PolyOne, Kutka signed an Employee Agreement with PolyOne, which is dated December 26, 2007.  On two other occasions, February 6, 2009, and July 5, 2011, Kutka again signed Employee Agreements with PolyOne.  The July 5, 2011 Employee Agreement (the "Employee Agreement," or the "Agreement") is attached hereto as Exhibit A.

20.     Kutka's Employee Agreements provided that he would not compete with PolyOne during his employment with PolyOne.  This included promoting or assisting, financially or otherwise, a competitor of PolyOne.

> During my PolyOne employment, I will not compete with PolyOne anywhere in the world. . . . I will not:
>
> (a) Enter into or engage in any business that competes with PolyOne's business;
>
> (b) Solicit customers, business, orders for, or sell any products or services in competition with, or for any business that competes with, the business of PolyOne;
>
> (c) Divert, entice, or take away any customers, business, orders or sales of PolyOne or attempt to do so; and/or
>
> (d) Promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business that competes with the business of PolyOne.

(Agreement, ¶ 4.)

21.     As a part of the Agreement, Kutka also agreed to a post-employment non-competition covenant, pursuant to which he agreed not to compete with PolyOne for a period of

one year after the termination of his employment.  Specifically, the Agreement provides that

Kutka will not engage in "Prohibited Activities," which are defined, among other things, as:

> I am prohibited from being employed by or entering into or engaging in any business which competes with PolyOne's business within the Restricted Territory applicable to me as defined above;
>
> I am prohibited from soliciting customers, business, orders for, or selling any products or services in competition with, or for any business that competes with, the business of PolyOne;
>
> I am prohibited from diverting, enticing, or taking away any customers, business, orders, or sales of PolyOne or attempting to do so; and/or
>
> I am prohibited from promoting or assisting, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the business of PolyOne.

(Agreement, at Attachment A, ¶ 2.)

22.    The Agreement further provided that Kutka would protect all of PolyOne's

confidential and trade secret information with which he was entrusted (Agreement, at ¶ 11) and

that he would "return in good condition all PolyOne property and Confidential Information."

(*Id.* at ¶ 12.)

23.    In addition to requiring certain employees to sign employee agreements,

PolyOne's Code of Conduct, which is provided to all employees, also emphasizes the critical

importance of maintaining PolyOne's confidential and proprietary information:

> Our competitive edge can be easily diminished if others gain access to PolyOne's proprietary information, innovative ideas or intellectual property and use it to develop competing products or to gain positions with our customers.  These are intangible assets that must be appropriately managed and protected.  Examples include information pertaining to product and process technology, competitive position, directional strategy, customers, product costs, commercial information and trade secrets. . . .
>
> For PolyOne to grow and succeed, this proprietary and sensitive information must be kept confidential and protected.  Therefore, as a PolyOne director or employee, you have a personal stake and responsibility to ensure that valuable company information is not disclosed to others.

Kutka most recently electronically signed the Code of Conduct acknowledgement on October 26, 2012.  A copy of the electronic acknowledgement is attached hereto as Exhibit B.

### *Formation of the Conspiracy*

24.     Martin Lu and Tyler Xu formed PolyMax Nantong in 2005 with the assistance of the regional Chinese government, which provided land for PolyMax's manufacturing facilities and its R&D labs.  The business of PolyMax Nantong is the manufacture and sale of TPEs, and therefore it is a competitor of PolyOne GLS, which also had operations in China.  PolyMax Nantong also became a competitor of PolyOne GLS globally, including in the United States.

25.     Lu went to college in China before coming to the United States to obtain multiple advanced degrees: a Master's and Ph.D. in chemistry from the Stevens Institute of Technology in Hoboken, New Jersey, and a MBA from the University of Chicago.  He worked for PolyOne GLS as a formulator of TPEs.  He then joined Xerox, where he had little to no experience in formulating TPEs.  Lu left Xerox to start Nantong PolyMax.  Lu's experience in formulating commercial TPEs came from his employment with PolyOne GLS.

26.     Sometime in 2008, Lu discussed with Kutka the idea of his joining PolyMax.  In January 2009, Kutka sought an opinion of an Ohio lawyer as to whether his employment by PolyMax would violate his Employee Agreement with PolyOne.  The lawyer's written opinion stated that Kutka was banned from working in the TPE area under his non-compete agreement for at least a year after his termination of employment with PolyOne and that if he left PolyOne "to go to PolyMax or any other firm making TPEs, PolyOne can sue you."  Kutka shared his lawyer's warning, if not letter, with Lu.

27.     Rather than leaving PolyOne GLS, Kutka accepted a substantial retention bonus from PolyOne, but secretly he pursued a relationship with PolyMax, a known Chinese competitor.  Kutka was eventually paid a substantial retention bonus by PolyOne.  At or around

9

the time that Kutka was offered the retention bonus, he was also required to execute an Employee Agreement with PolyOne, discussed above.

28.     In the summer of 2009, Kutka flew to China ostensibly on PolyOne business. While there, he secretly diverted to meet with Lu and Xu at PolyMax's headquarters in Nantong. He toured the facility, inspected its laboratory and manufacturing lines, and met with employees and technicians of PolyMax.  He even posed for photographs with Lu and Xu in front of the PolyMax facility.  Kutka then attended the PolyMax company outing in China.  Kutka returned to the United States, telling no one at PolyOne what he had done.  PolyOne paid for his airfare to and from China.

29.     In 2010, Kutka began assisting PolyMax in the United States.  Among other things, he began to recruit talent for PolyMax in the United States, and later he helped to facilitate a meeting between a PolyOne trusted vendor and Martin Lu for the purpose of establishing a business relationship between PolyMax and the vendor.

30.     Sometime in the fall of 2010, Kutka and Castile began to discuss a major business opportunity for PolyMax and for themselves in the United States.  Kutka recruited Castile to get back into the TPE market, which he had been out of since leaving PolyOne in 2006.  At the time, Kutka was still working for PolyOne GLS and Castile worked for a company headquartered in the Netherlands with offices in the United States, but he had no involvement in the TPE industry and was not competing against PolyOne GLS in that employment.  That would all change in December 2010.

31.     The business opportunity Kutka and Castile identified involved Customer X. Customer X manufactures a product using TPEs.[1]  PolyOne GLS once supplied Customer X with

---

[1] The identity of PolyOne's customers and the customer's products have been redacted in this public filing due to the confidential nature of the customer relationship and the potential applicability of non-

TPEs for its product and was aware of a new opportunity to recapture some of its business in 2010.  The opportunity arose because a competitor of Customer X was going out of business and had entered into an agreement allowing Customer X to make its products using formulations for TPEs that this competitor had considered to be its protected Intellectual Property. Now that Customer X could utilize the new TPE formulations, PolyOne GLS had a new opportunity to regain the business of Customer X.

32.     Unbeknownst to PolyOne, Kutka was acting as a double-agent with respect to Customer X.  He and Castile conceived of approaching Customer X with the idea that the new opportunity would be shared with PolyMax and PolyMax would become the provider of the new TPE products that Customer X would purchase.  Kutka, Lu and Castile had all participated in servicing Customer X, including the creation of multiple TPE formulations for Customer X and the pricing of its products, while with PolyOne GLS.  Further, Kutka had formulated TPEs for the competitor of Customer X and knew of its formulations, which were now open to Customer X to utilize.  Kutka maintained on his company computer (and a personal external hard drive) the trade secret formulations and pricing model for the competitor's TPE.

33.     Kutka contacted Lu and Xu in December 2010 to arrange a meeting with the two of them and Tom Castile at a restaurant outside Chicago.  "Tom and I have been talking for the last few months," Kutka wrote to Lu and Xu, "and would like to investigate whether potential opportunities could exist between our two groups."  The four men met at Kawa Japanese Restaurant in Grayslake, Illinois, on December 29, 2010.  They entered into an unlawful agreement to work together to establish PolyMax's operations in the United States and targeted Customer X as the first "beachhead" customer for the PolyMax U. S. venture.  They also

disclosure agreements that PolyOne has executed with its customers.  PolyOne has filed under seal a detailed Motion for Preliminary Injunction, which identifies the customers and products pursuant to the terms of this Court's Protective Order (Dkt. 19).

targeted other PolyOne GLS key customers to solicit and steal.  They knew that Kutka still worked for PolyOne GLS and that his assistance of this venture and participation in the conspiracy was a violation of his Employee Agreement with PolyOne GLS and his duty of loyalty to his employer.  They also knew that as a trusted key employee, Kutka had access to PolyOne's most sensitive technical, sales, marketing, pricing and other trade secret and confidential information, including formulations that could be used in the opportunity with Customer X and other PolyOne GLS customers.

34.     Castile documented the conspiracy meeting in an email dated January 4, 2011. He wrote to Lu and Xu, and copied Kutka.  He wrote: "Joe and I are both very excited about the potential opportunity to develop the US market together with PolyMax. We will be in contact later this month as we progress on our plans as discussed."

35.     Two days later, Kutka sent to Castile the letter from his Ohio attorney that he had obtained in January 2009, the contents of which he had already shared with Lu.  Kutka wrote: "Based on my background – I feel that PolyOne would sue.  But we can always chance it." Kutka told no one at PolyOne GLS of his treacherous activities.

### *Overt Acts in Furtherance of the Conspiracy*

36.     The conspirators began acting on the conspiracy agreement.

37.     Within three weeks of entering into the conspiracy agreement, Lu, back in China, wrote an email to Kutka and Castile encouraging them on the Customer X project, advising that progress had been made identifying investors to finance "our US operations," and sending a Fedex Nantong PolyMax number so that Kutka and Castile could mail packages to China, including samples of the TPE pellets from Customer X.

38.     On or about January 19, 2011, Castile sent a one kilo sample of TPE pellets of Customer X to Lu and Xu in China to be analyzed at Nantong PolyMax.

39.     In February 2011, Kutka flew to China purportedly on PolyOne business but likely met with Xu and Lu while there.

40.     Kutka found out from one of his customer contacts at PolyOne GLS that the competitor of Customer X was going to have an auction to sell TPE manufacturing lines and lab equipment, which could be used in formulation and manufacture of TPEs for Customer X.  The equipment could also be used by PolyMax to set up or equip a plant in the United States.  Kutka wrote to the conspirators on March 16, 2011, that the equipment, including molding machines and compounding equipment, was up for auction and that PolyMax and the conspirators "may get at a good price."  Kutka and Castile also spoke by phone and using skype with Lu and Xu about the equipment and the plans to purchase some or all of it for the U.S. operation.

41.     Kutka was charged by the conspirators with the task of finding out about the condition of the equipment.  In support of the conspiracy, Kutka contacted a high level former employee of the competitor of Customer X—who he had known as a customer of PolyOne GLS—to discuss the equipment up for auction.  He reported his findings to Lu and Xu in China via telephone or skype and, as a consequence, Tyler Xu was dispatched by Nantong PolyMax to participate in the auction of the equipment in the United States.  PolyMax purchased a lab extruder line at the auction and moved the line to China.  Subsequently, the line has been moved to the plant currently being leased by PolyMax just outside Chicago.

42.     During this time, Lu worked on formulations for TPE products for Customer X at the laboratories at Nantong PolyMax.  At the time, Kutka had access to formulations that he and Lu had created for Customer X while Lu worked as a scientist, under Kutka's supervision, at

13

PolyOne GLS.  Further, Kutka maintained on his computer formulations for the TPE products and highly sensitive pricing models that established pricing for raw materials and manufacturing costs to manufacture the TPE products.  Kutka downloaded these files and tens of thousands more in the Spring of 2013 as he moved to join PolyMax.  Upon information and belief, Kutka shared this information with PolyMax and the conspirators.

43.     In addition, Lu, as a result of employment with PolyOne GLS, knew of its trade secret formulations and had worked on them himself while working at PolyOne GLS.  In creating formulations for Customer X in 2011, Lu had to have inevitably disclosed PolyOne GLS trade secret information or used the same in coming up with the Nantong PolyMax formulations.

44.     As a result, Nantong PolyMax began manufacturing TPE pellets for Customer X at the end of 2011 or beginning of 2012, and has sold in the United States millions of dollars in product already, which has been manufactured in China.  All of this activity has been in support of establishing the operations of PolyMax in the United States.  Castile claims commissions on the sales in the tens of thousands of dollars, though he has not taken payments yet.

### *The Conspirators' Fraudulent Scheme to Circumvent Kutka's Non-Compete Agreement*

45.     Having successfully established the "beachhead" customer for PolyMax in the United States by the summer of 2011, Kutka turned to his plan to leave PolyOne to join PolyMax.  Knowing he could not leave PolyOne GLS directly and join PolyMax because of the restrictions of his non-compete agreement with PolyOne GLS, Kutka explored "interim" employment outside PolyOne.  He failed to find acceptable employment, writing to a confidential friend that no one could match his salary and benefits at PolyOne GLS.  "One thing I learned," Kutka wrote, "is that after I added all my benefits, I have a pretty good deal with GLS."

14

46.     Kutka came up with a scheme of how to defeat his non-compete agreement with PolyOne.  He decided to seek employment in another division of PolyOne.  In his false thinking, he could argue that this would be the equivalent of going to another company altogether, while still allowing him to maintain his high salary and benefits.  It was a complete ruse.  In the summer of 2011, Kutka moved from PolyOne's GLS division to work for PolyOne's Geon division.

47.     Kutka's move was a fraud on PolyOne and his conspirators knew it and participated in the fraud.  He wrote to them in an email dated September 2, 2011, that his move to become the Business Development Manager of Healthcare for Geon Performance Materials "has essentially cut my ties being involved with TPEs."

48.     Martin Lu responded by email on September 17, 2011, that, "I certainly also wish that we can working together again now that your clock started."

49.     PolyOne relied upon Kutka's misrepresentations that his move to PolyOne Geon was in good faith and that he intended to perform his services at a high level. Instead, Kutka's evaluations turned from ratings of "meeting expectations" to "not meeting expectations," which he did not care about, as he intended to leave PolyOne in the summer of 2013 (he erroneously believed he needed to serve two years on his non-compete).

50.     During this time that Kutka and his conspirators were defrauding PolyOne, Kutka continued to have access to highly sensitive PolyOne trade secrets and confidential information. Upon information and belief, Kutka used this access to further the goals of the conspirators to target, solicit, and improperly obtain business opportunities from PolyOne GLS's biggest customers.

### *Further Overt Acts in 2013*

51.     Beginning in January 2013, the conspirators began working together to facilitate Kutka's fraudulent scheme to leave PolyOne to join PolyMax, without losing one day of Kutka's salary and benefits with PolyOne.  Kutka wanted to move seamlessly from PolyOne to PolyMax.

52.     In furtherance of the conspiracy, the conspirators tasked Kutka with obtaining a legal opinion from an Ohio lawyer.  Kutka did so, but failed to disclose critical facts to the Ohio lawyer in securing his opinion.  Kutka shared the results of the Ohio lawyer's work with the conspirators.

53.     The conspirators also agreed to provide Kutka with the bogus title of Vice President of Operations for PolyMax, even though each of them knew that Kutka had no experience in operations.  Martin Lu was the person with operations experience.  The title was meant to further defraud PolyOne, as its only purpose was to make it appear that Kutka was not in a position that would "compete" with the technical, sales and marketing positions he held at PolyOne.  Kutka's title was a hoax.

54.     In furtherance of the conspiracy, Kutka and Castile recruited a former PolyOne GLS consultant named Rob Banning of Trimax to join PolyMax in its operations in the United States.  Banning had been a highly paid consultant to PolyOne GLS and had signed confidentiality agreements while working for PolyOne GLS.  He developed detailed market analyses and reports for PolyOne GLS on the TPE markets in the United States and globally.  Banning also trained sales and marketing employees of PolyOne GLS.  Under his confidentiality agreements, Banning was exposed to a great deal of confidential and trade secret information belonging to PolyOne GLS.

16

55.     As a direct result of the recruiting efforts of Kutka and Castile, Banning signed an agreement to consult for PolyMax in the United States over a lengthy period of time for significant compensation and potential bonuses based on customers and business delivered as a result of his efforts.

56.     Kutka, Castile and Lu also recruited another past GLS employee to join PolyMax at a dinner at Bobby's Deerfield Restaurant in Deerfield, Illinois, on April 25, 2013.

57.     The former GLS employee wrote after the dinner: "It was great seeing you guys last night. I was left in amazement at what you guys were putting together. Pretty fun stuff."

58.     Upon information and belief, the conspirators have engaged in other overt acts in furtherance of the conspiracy.

### *Kutka Downloads Tens of Thousands of Highly Sensitive PolyOne GLS Files*

59.     In May 2013, as he made his plans to leave PolyOne that summer and before taking a family vacation to Ireland, Kutka downloaded to hard drives and flash drives tens of thousands of PolyOne GLS trade secret, proprietary and confidential files. He downloaded over 7,000 files on May 6, 2013, and 15,000 files on May 21, 2013. He also downloaded files later in 2013.

60.     Kutka described these files as representing his entire "history with the company."

61.     He admitted that he should not have kept the files and should have deleted them.

62.     Kutka also purchased large capacity USB flash drives in the fall of 2013, coincident with his notices to PolyOne that he intended to terminate his employment. Kutka failed to disclose the existence of these USB flash drives.

### *Kutka's Resignation from PolyOne and Intention to Join PolyMax*

63.     Almost exactly two years following Kutka's move to PolyOne's Geon division, on or about September 6, 2013, Kutka informed his management at PolyOne that he was considering resigning his position at PolyOne to accept employment with PolyMax.

64.     On September 20, 2013, PolyOne submitted a written response to Kutka in which he was informed that PolyOne would consider Kutka's employment with PolyMax, a direct competitor of PolyOne, a breach of his Employee Agreement.

65.     Specifically, PolyOne wrote that Kutka's Employee Agreement provides that the Restricted Territory is defined as all of North America (by virtue of the geographic area to which Kutka was assigned and responsible for at the time of his termination), and because Kutka would be accepting a position with a competitor of PolyOne in North America, the employment would violate the Employee Agreement.

66.     Further, PolyOne wrote that Kutka had received a substantial amount of confidential business and technical information during his long tenure in senior management and that, as a result of his technical and marketing positions, it would be impossible for Kutka to perform similar duties for PolyMax without  inevitably disclosing PolyOne's trade secret information.  All of Kutka's knowledge about the TPE industry and the operation of a manufacturing facility originate from his high-level positions at PolyOne GLS.

67.     In sum, PolyOne specifically warned Kutka that it would consider Kutka "in breach of your Employee Agreement if you become employed by PolyMax."

68.     On or about September 23, 2013, Kutka inquired whether he would be permitted to remain employed with PolyOne if he did not accept the position at PolyMax.  The question was part of his artifice to defraud PolyOne.  Kutka had no intention of remaining with PolyOne.

18

The sole purpose for his request was to try to provoke his own firing, thus giving him an argument that his non-compete agreement would be voided.

69.     On that same day, PolyOne, not knowing of Kutka's fraudulent intentions, assured Kutka that he could continue as an employee with PolyOne and that his services were valued by PolyOne.

70.     Despite these warnings, on November 18, 2013, Kutka announced that he was resigning his employment with PolyOne and informed his supervisors of his decision to accept a position with PolyMax as Vice President of Operations.

71.     At the time of his exit interview, Kutka informed PolyOne that he had confidential information belonging to PolyOne on an external hard drive. He failed to disclose other devices he maintained.

72.     Kutka's position at PolyMax will be based in or around Chicago, Illinois. Because the geographic Restricted Territory under Kutka's Employee Agreement is all of North America (the geographic area for which he was assigned to and responsible for at the time of the termination of his employment) and because PolyMax is a direct competitor of PolyOne in the TPE market, Kutka's employment with PolyMax is a direct violation of the terms of his Employee Agreement.

### *Irreparable Harm to PolyOne*

73.     Paragraph 17 of the Kutka's Employee Agreement provides that "temporary and permanent injunctive relief may be granted in any proceeding that may be brought to enforce any provision contained in Paragraphs 4, 5, 6, 11, 12, 13, 16, and Attachment A, inclusive, of this Agreement, without the necessity of proof of actual damage."

74.     Although it is not necessary for PolyOne to prove actual damage, PolyOne is threatened with imminent irreparable harm from Kutka's breach of his non-competition covenant, his surreptitious efforts to assist PolyMax in start-up operations in the United States before he even left PolyOne, and his inevitable misappropriation of PolyOne's trade secret information where he will be acting in a role that mimics his operations role and responsibilities with PolyOne.  Kutka held numerous high-level, key roles at PolyOne's GLS division, and through these roles, has gained access to an innumerable amount of confidential information and trade secrets, including relating to PolyOne's operations—the same role that he will hold with PolyMax.

75.     Furthermore, Kutka had access to PolyOne's most sensitive information surrounding potential new products and company strategy regarding the development and launch of new technologies.  If Kutka were to reveal—either deliberately or inadvertently—PolyOne's strategies, research tracks, product development considerations, formulas, identities of customers, customer preferences, or proprietary commercial, research and development, and manufacturing systems, PolyOne would be irreparably harmed.

76.     In addition to his technical roles at PolyOne, Kutka was a high level sales and marketing employee who was responsible for PolyOne's key TPE accounts.  Following his resignation from PolyOne, Kutka has retained the telephone number that he used for PolyOne business, including the telephone line that he used for his home office and mobile number (262.245.9366).  Accordingly, PolyOne customers who call this number, expecting to reach a PolyOne employee, would instead be diverted to PolyOne's direct competitor, PolyMax.

77.     Because of his access to highly sensitive information relating to all aspects of PolyOne's TPE business, unless Kutka is restrained and enjoined from continuing employment

20

with PolyMax, it is inevitable that he will use or disclose PolyOne's confidential, proprietary and trade secret information and that PolyOne will suffer loss of valuable intellectual property assets, the loss of customers, and other damages.

78.     In addition to irreparable harm that PolyOne will suffer if Kutka is not enjoined from working for or communicating with PolyMax, Nantong PolyMax, Lu, Xu and Castile, PolyOne will suffer irreparable harm if PolyMax, Nantong PolyMax, Lu, Xu and Castile are not enjoined from any further contacts with Kutka, continuation of its work with Customer X, which was procured through tortious and fraudulent means and as a result of the misappropriation and use of PolyOne trade secret and confidential information, and from contacting, soliciting PolyOne customers, business, orders, or sales, or from diverting, enticing, or taking away PolyOne customers, business, orders, or sales, and/or misappropriating or using PolyOne GLS confidential or trade secret information.   Further, PolyOne will suffer irreparable harm if Nantong PolyMax, PolyMax, Kutka, Lu, and Xu do not immediately return all confidential information and property belonging to PolyOne, including all copies of the same.

### *Kutka's Spoliation of Evidence*

79.     Kutka was aware of the prospect that PolyOne would sue him if he assisted or joined Nantong PolyMax, PolyMax, Lu, Xu, and/or Castile in setting up the PolyMax U.S. operations and/or in competing with PolyOne.  He sought Ohio counsel in January 2009 and was advised of the likelihood of a suit being brought by PolyOne.  He again sought legal advice from the Ohio law firm in 2013 on the prospect of being sued by PolyOne should he take steps to join PolyMax.

80.     Despite this awareness that a lawsuit was likely to be filed, at some point in 2013 or even before, Kutka consciously deleted from his personal email account some of the most

damning emails involving the conspiracy, including, among other, the January 4, 2011 email that documents the conspiracy meeting and agreement and a series of emails in July 2013 to and from Martin Lu in which Kutka reviewed and commented on the proposed layout of the facility PolyMax intended to use as it plant and lab in the United States.

81.     Kutka deleted these emails in an attempt to hide and destroy evidence.  He kept other emails from the same time period and scores of emails that were ads or jokes or spam.

82.     The damning emails he deleted were produced by Castile and Lu.

83.     Kutka could not explain his actions in deleting the damning emails.

84.     In addition, Kutka lied under oath in answering interrogatories in expedited discovery, produced select emails that he believed were exculpatory and otherwise attempted to hide and conceal his conduct in response the document requests and deficiency letters from counsel.

85.     Kutka engaged in a pattern of deception during expedited discovery ordered by this Court.

### Count I – Breach of Non-Compete Agreements During Employment (Kutka)

86.     PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

87.     Kutka voluntarily acknowledged and agreed to the terms of the Agreement, which is a valid, enforceable contract.

88.     Pursuant to Paragraph 4 of the Agreement, Kutka covenanted and agreed that during his employment with PolyOne he would not engage in certain prohibited activities, including, among other things, soliciting and diverting customers and business away from PolyOne and promoting or assisting any entity that competes with PolyOne's business.

89.     In violation of Paragraph 4, during his employment with PolyOne, Kutka assisted PolyMax, a direct competitor of PolyOne, to divert PolyOne's customers and business opportunities and strengthen PolyMax's operations in the United States.

90.     As a result of Kutka's breach of the Agreement, PolyOne has suffered, and will continue to suffer, damages and irreparable harm for which it has no adequate remedy at law. Kutka specifically acknowledged in Paragraph 17 of the Agreement that any remedy at law available to PolyOne for any breach of the Agreement would be inadequate and that PolyOne may be entitled to injunctive relief for a breach of Paragraph 4.

### Count II – Breach of Non-Compete Agreements After Employment (Kutka)

91.     PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

92.     Kutka voluntarily acknowledged and agreed to the terms of the Agreement, which is a valid, enforceable contract.

93.     Pursuant to Paragraph 5 of the Agreement, Kutka covenanted and agreed that he would not engage in certain prohibited activities following the termination of his employment, including, among other things, being employed by or entering into or engaging in any business which competes with PolyOne's business.

94.     Upon information and belief, Kutka has commenced employment with PolyMax. PolyMax is directly competitive with PolyOne, particularly PolyOne's TPE business, the business in which Kutka was employed for 17 years.  Kutka's employment with PolyMax is a breach of Paragraph 5 of the Agreement.

95.     Upon information and belief, Kutka will be employed by PolyMax either in his home office in Wisconsin or in PolyMax's facility in suburban Chicago.  The definition of

23

Restricted Territory in the Agreement provides that Kutka's employment for a competitor of PolyOne within North America is a violation of the Agreement. Kutka's employment with PolyMax breaches Paragraph 5 of the Agreement.

96.     As a result of Kutka's breach of the Agreement, PolyOne has suffered, and will continue to suffer, damages and irreparable harm for which it has no adequate remedy at law. Kutka acknowledged in Paragraph 17 of the Agreement that any remedy at law available to PolyOne for any breach of the Agreement would be inadequate and that PolyOne may be entitled to injunctive relief for a breach of Paragraph 5.

### Count III – Breach of Confidentiality Agreement
### (Kutka)

97.     PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

98.     Kutka voluntarily acknowledged and agreed to the terms of the Agreement, which is a valid, enforceable contract.

99.     Pursuant to Paragraph 11 of the Agreement, Kutka covenanted and agreed, among other things, that he would keep secret all confidential information learned or disclosed to him during the course of his employment with PolyOne.

100.     By accepting and commencing employment with PolyMax, a direct competitor of PolyOne that is attempting to establish its first facility in the United States, Kutka will inevitably disclose confidential information learned by him during the course of his employment with PolyOne.

101.     By accepting employment with a direct competitor of PolyOne, PolyOne anticipates that Kutka will imminently breach the Agreement by disclosing confidential and/or proprietary information that he learned during the course of his employment with PolyOne.

24

102.     As a result of Kutka's breach of the Agreement, PolyOne has suffered, and will continue to suffer, damages and irreparable harm for which it has no adequate remedy at law. Kutka acknowledged in Paragraph 17 of the Agreement that any remedy at law available to PolyOne for any breach of the Agreement would be inadequate and that PolyOne may be entitled to injunctive relief for a breach of Paragraph 11.

### Count IV – Misappropriation of Trade Secrets
### (Kutka, Lu, Castile, PolyMax Nantong, PolyMax)

103.     PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

104.     PolyOne's trade secret information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and it has been and is the subject of efforts by PolyOne that are reasonable under the circumstances to maintain its secrecy.  For example, PolyOne restricts access to and disclosure of its confidential, proprietary and trade secret information by, among other things, physically securing its facilities and documents, password protecting electronic documents and databases, employing confidentiality agreements and numerous other measures to protect the secrecy of its information.  PolyOne also communicates its expectations regarding use and disclosure of confidential information to its employees through the PolyOne Code of Conduct.

105.     By virtue of his lengthy, senior-level employment at GLS in positions that covered research and development, operations, sales, and marketing, Kutka is aware of significant confidential information relating to PolyOne's TPE business.  More importantly, because Kutka's only employer in the TPE compounding business has been GLS, the *only* knowledge about the development, manufacturing, marketing, sales, and operations of a TPE

facility is through his employment with PolyOne.  The only way that Kutka knows how to formulate or manufacture TPEs is as a result of his employment at PolyOne GLS.  Kutka knows PolyOne's trade secrets, knows how to establish a manufacturing and research and development facility, and knows how to perfect the manufacture of TPEs—all trade secrets from PolyOne. Many of the formulations on which Kutka worked or supervised while he was the head of PolyOne GLS's Research and Development department are still in use today in PolyOne's most strategic markets and by PolyOne's most important customers.  By going to a start-up facility in Chicago, Kutka will be Vice President of Operations at a plant being built from the ground up. Kutka will necessarily and inevitably reveal PolyOne's trade secret information in his employment with PolyMax, because Kutka knows of no way to manufacture and sell TPEs except for how he was taught at PolyOne.

106.    Beyond his manufacturing and formulations experience, Kutka has knowledge of actual and potential customer and developed valuable relationships at customers and suppliers, customer preferences, the establishment of marketing strategies and objectives, research and development opportunities, and PolyOne's best business practices, all of which is highly confidential trade secret information.  Indeed, because he has no other TPE experience except for PolyOne, Kutka was undoubtedly targeted by PolyMax because of the positions that he held while at PolyOne and because of his knowledge of TPE operations at GLS, learned by virtue of his employment at PolyOne.

107.    PolyMax is a competitor of PolyOne in the thermoplastic industry.  Kutka's employment with PolyMax will inevitably *require* him to utilize confidential and proprietary trade secret information belonging to PolyOne for the direct benefit of one of PolyOne's direct competitors.

26

108.     Unless restrained and enjoined from continuing employment with PolyMax, it is inevitable that he will use or disclose PolyOne's confidential, proprietary and trade secret information and that PolyOne will suffer loss of valuable intellectual property assets and the loss of customers and other damages.

109.     Unless enjoined, Kutka's inevitable disclosure and use of PolyOne's trade secrets threatens PolyOne with irreparable harm for which it has no adequate remedy at law by depriving PolyOne of control over and exclusive use of the valuable intellectual property assets comprising PolyOne's trade secret information.

110.     Unless Kutka is enjoined by the Court from using or disclosing PolyOne's trade secret information, PolyOne will suffer loss of its valuable intellectual property assets and loss of customers and other damages in an amount to be determined but reasonably believed to exceed $75,000.

### Count V – Breach of the Duty of Loyalty/ Faithless Servant (Kutka)

111.     PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

112.     As an employee of PolyOne, Kutka owed PolyOne a duty of loyalty to act in the interests of PolyOne and not to act in his personal interests adverse to PolyOne or in the interests of PolyMax.

113.     While employed by PolyOne, Kutka performed several overt actions to assist PolyMax, a direct competitor of PolyOne.

114.     Kutka kept PolyMax apprised of crucial business opportunities that he should have rightfully and properly disclosed to PolyOne.  During the course of his employment with PolyOne, Kutka became aware that a competitor of Customer X had entered bankruptcy and was

liquidating its equipment.  Kutka notified PolyMax and Lu about the opportunity to purchase the equipment, and, on behalf of PolyMax and/or PolyMax Nantong, took steps to identify the condition of the equipment in order to advise Martin Lu whether it should be purchased.  Kutka did not disclose this conduct to PolyOne.  Kutka did not act in PolyOne's best interests when he informed PolyMax about this auction and made inquiries about the condition of the equipment on PolyMax's behalf.

115.    Kutka assisted PolyMax with recruiting key personnel, including other former GLS employees and consultants, and one of PolyOne GLS's color vendors.  Kutka attended meetings at which PolyMax was attempting to recruit these potential employees, and actively discussed PolyMax employment and consulting opportunities with these individuals, all while he was employed by PolyOne, a direct competitor of PolyMax.  Kutka was not acting in PolyOne's best interests when he recruited former PolyOne GLS employees to work for PolyMax, a competitor of PolyOne.

116.    While still employed by PolyOne, Kutka was in possession and reviewed files named "3210_Layout.pdf," "Plant_Layout.tif," and "3210_North_Oak_Grove_Avenue.pdf." Upon information and belief, these files were provided to Kutka by PolyMax or its agent, Martin Lu, and relate to a manufacturing facility located at 3210 North Oak Grove Avenue, Waukegan, Illinois.  Upon information and belief, PolyMax has purchased or leased the facility, or is considering purchasing or leasing this facility, and these files, including the plant layout, were provided to Kutka for the purpose of allowing him to consult with or advise PolyMax on the layout or design of the facility.

117.    Kutka did not act in PolyOne's best interests when he reviewed these files and, upon information and belief, assisted PolyMax, PolyOne's competitor, with the facility layout

28

and/or other considerations related to the facility.  Instead, upon information and belief, Kutka acted to facilitate the business of a direct competitor to PolyOne, all to PolyOne's detriment, while he was still employed by PolyOne.

118.    Upon information and belief, Kutka, while employed by PolyOne, used PolyOne's property, including phones, computers, and email systems, to assist a competitor of PolyOne and to compete with PolyOne, all to the detriment of PolyOne.

119.    Each of the above listed acts, and others, violates Kutka's duty of loyalty to PolyOne.

120.    As a result of breaching his duty, Kutka is not entitled to any compensation for his employment between at least June 1, 2009, when he first breached his duty, and November 2013, when Kutka terminated his employment with PolyOne.

121.    Based upon his breach of his duty of loyalty, Kutka should forfeit any compensation paid to him during the period that he was disloyal.

122.    Because Kutka's faithlessness was egregious and pervasive throughout his employment at a time when he was granted access to PolyOne's confident and valuable trade secret information, PolyOne is entitled to an injunction prohibiting Kutka from continuing to work with PolyMax.

### Count VI- Civil Conspiracy
### (All Defendants)

123.    PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

124.    Kutka conspired with Martin Lu, Tom Castile, Tyler Xu, PolyMax, and PolyMax Nantong to tortuously interfere with Kutka's employment agreement with PolyOne in a way not competent for one alone.

125.     The conspirators injured PolyOne by depriving PolyOne of the faithful employment of Kutka and the benefit of the non-compete agreement that was a condition of Kutka's employment with PolyOne and disclosing and utilizing PolyOne's confidential and trade secret information.

126.     The conspirators committed several over acts in furtherance of the conspiracy.

### Count VII – Fraud in the Inducement
(Kutka)

127.     PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

128.     By signing employee agreements on February 6, 2009, and on July 5, 2011, Kutka represented that he was going to act as a faithful and loyal employee of PolyOne.

129.     Kutka made those representations knowing them to be false.  At the time he signed the agreements, Kutka was already acting disloyally to PolyOne by assisting PolyMax, a direct competitor of PolyOne, by diverting customers and business opportunities, divulging sensitive and confidential information and assisting with the inception of PolyMax's operations in the United States.

130.     Kutka made those representations to induce PolyOne to rely upon the representations and continue Kutka's employment with PolyOne.

131.     PolyOne did rely on Kutka's representations and continued to employ him and entrust him with PolyOne's valuable trade secret information.

132.     PolyOne was damaged by relying on Kutka's representations because PolyOne was deprived of the services and loyalty of one of its key employees and PolyOne disclosed to Kutka PolyOne's sensitive and confidential information.

30

133.     Kutka's actions were intentional, willful and wanton and performed with malice. Accordingly, PolyOne should be awarded compensatory and punitive damages as well as attorneys' fees and the costs of this action.

### Count VIII – Fraud
### (All Defendants)

134.     PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

135.     From the period of Summer 2008 until September, 2011, as described in detail above, Kutka, acting on behalf of himself and as an agent for his co-conspirators, Lu, Xu, Castile, PolyMax Nantong, and PolyMax, falsely represented to PolyOne that he was a faithful and loyal employee to PolyOne, and he failed to disclose to PolyOne that he had entered into a conspiracy to misappropriate PolyOne's trade secrets, confidential information, and customers.

136.     In connection with the hiring process at PolyOne's Geon division, Kutka falsely represented that he would be a loyal employee to PolyOne and that he would give his best efforts to promote PolyOne's business.

137.     As an employee of PolyOne, Kutka had a duty to disclose that he was working with direct competitors of PolyOne, but Kutka did not do so.  Kutka, acting as an agent for the conspiracy, had a duty to disclose his conduct to PolyOne, but did not do so.

138.     Kutka falsely represented to PolyOne that he was a faithful and loyal employee, despite that he had full knowledge that he was assisting PolyOne's direct competitors.

139.     Kutka, acting on behalf of himself and his co-conspirators, made the false representations with the intent of misleading PolyOne into relying upon them, continuing Kutka's employment with PolyOne, and to mislead PolyOne into hiring Kutka at PolyOne's

Geon division, all for the purpose of allowing Kutka to continue in the conspiracy to misappropriate PolyOne's business and trade secret information.

140.    PolyOne justifiably relied on Kutka's misrepresentation and concealment.

141.    As a direct and proximate result of Kutka's misrepresentations, PolyOne suffered damages in excess of $75,000.

142.    Kutka's tortious actions were intentional, willful, wanton, and performed with malice.  Accordingly, PolyOne should be awarded compensatory and punitive damages, and should also be awarded its attorneys' fees and the costs of this action.

<u>**Count IX – Computer Fraud and Abuse Act (18 U.S.C. § 1030)**</u>
<u>**(All Defendants)**</u>

143.    PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

144.    Kutka's breach of his duty of loyalty to PolyOne terminated his agency relationship with PolyOne.

145.    By virtue of the termination of his agency relationship with PolyOne, Kutka did not have any authorization to access PolyOne's computers and servers, and Kutka's downloading of PolyOne's confidential information to his personal external hard drives and USB drives violated PolyOne's policies regarding electronic information.

146.    Kutka knowingly and intentionally accessed PolyOne's protected computers, which are used in interstate commerce, without authorized access or in excess of his authorized access by using a PolyOne-issued computer to download PolyOne's confidential and trade secret information from its protected computers and servers to various USB devices.  Upon information and belief, Kutka accessed PolyOne's computers for the purpose of using the information for the benefit of his co-conspirators, or providing the information to the his co-conspirators.

147.    Upon information and belief, Kutka conspired with PolyMax Nantong, PolyMax, Lu, Castile, and Xu that he would access PolyOne's protected computers and servers for the purpose of obtaining PolyOne's confidential and trade secret information, all for the purpose of providing such information to the other defendants.

148.    As a result of Kutka's unauthorized access, PolyOne has hired an external computer forensic consultant to assess what files were taken, an assessment of whether files were deleted, whether computer "wiping" software was used, and Kutka's usage history of PolyOne's computers.

149.    PolyOne suffered losses in excess of $5,000 by virtue of Kutka's violation of the Computer Fraud and Abuse Act, which he violated in concert with the remaining defendants.  In addition, the foregoing conduct is continuing and threatens PolyOne with imminent irreparable harm for which it has no adequate remedy at law.

### Count X – Tortious Interference With Contract
### (PolyMax Nantong, PolyMax, Lu, Castile, and Xu)

150.    PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

151.    PolyMax, PolyMax Nantong, Lu, Castile, and Xu were aware of the existence of Kutka's Employee Agreement and were aware that the Employee Agreement contained both non-competition and confidentiality clauses.

152.    While Kutka was still employed by PolyOne, the defendants named in this Count wrongly interfered with PolyOne's employment relationship with Kutka by tortiously inducing Kutka to breach his Employee Agreement, provide confidential and trade secret information to PolyMax, PolyMax Nantong, Lu, Castile, and Xu, resign his position with PolyOne, and accept a position with PolyMax, all in violation of the Employee Agreement.  Upon information and

belief, PolyMax, PolyMax Nantong, Castile, Xu, and Lu induced, encouraged, and assisted Kutka in recruiting other employees to PolyMax, including former employees of PolyOne GLS, all to the detriment of PolyOne and in violation of Kutka's Employee Agreement and duty of loyalty.

153. The defendants named in this Count, through the conduct described above, have improperly caused disruption to PolyOne's employment relationship with its employee and improperly caused Kutka to breach his Employee Agreement with PolyOne. This conduct is without privilege or justification and the defendants named herein engaged in this conduct in a willful and malicious manner and with an improper motive and through improper means.

154. As a direct and proximate result of the foregoing conduct, PolyOne has suffered damages. In addition, the foregoing conduct is continuing and threatens PolyOne with imminent irreparable harm for which it has no adequate remedy at law.

155. PolyOne further seeks an award of punitive damages as a result of willful and wanton acts of the Defendants.

### Count XI – Tortious Interference With Prospective Relations
### (All Defendants)

156. PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

157. Through the conduct set forth in this Amended Complaint, including, without limitation, defendants' use of PolyOne's confidential and trade secret information in the solicitation of Customer X, the named defendants have intentionally and tortiously interfered with PolyOne's reasonable expectation of economic advantage and prospective contractual relationships with anticipated purchasers of products manufactured by PolyOne.

34

158.     PolyOne had previously been party to a long-standing commercial agreement to supply product to Customer X, and Defendants Kutka, Lu, and Castile were all involved in servicing Customer X for PolyOne GLS while they were employed by the company.  Lu and Kutka were involved in the formulation of Customer X's products, while Castile was involved in sales to Customer X.

159.     As a result of a patent dispute that required Customer X to change its product formulation, PolyOne lost Customer X's business; however, as a result Customer X's resolution of the patent dispute, PolyOne was again able to supply product to Customer X and, indeed, submitted a bid to Customer X, although the bid was eventually won by PolyMax.

160.     But for Defendants' wrongful acts, PolyOne had a reasonable likelihood of obtaining a contractual relationship with Customer X.

161.     Through its improper actions, PolyMax has obtained an unfair economic advantage over PolyOne.

162.     The use of PolyOne's trade secret and confidential information in connection with PolyMax's work for Customer X evidence an intent to harm PolyOne by competing unfairly and intending to prevent PolyOne's formation of contractual relations with Customer X.

163.     Defendant's conduct was without privilege or justification and was undertaken in bad faith.

164.     PolyOne sustained actual damages as a direct and proximate result of Defendants' willful conduct in tortiously interfering with PolyOne's prospective contractual relations.

165.     PolyOne further seeks an award of punitive damages as a result of willful and wanton acts of the Defendants.

## Count XII – Intentional Spoliation of Evidence
### (Kutka)

166.    PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

167.    In January 2009, Kutka sought the advice of counsel on whether his resignation from PolyOne to accept employment with PolyMax would be in violation of his Employee Agreement.  After receiving the opinion letter from counsel, Kutka wrote to Castile that in the event that he accepted employment with PolyMax, "I feel that PolyOne would sue."  Thus, at least as early as January 2009, Kutka himself wrote that he knew that litigation would be likely in the event that he accepted employment with PolyMax.

168.    At least since January 2009, Kutka has been under a legal duty not to destroy evidence relating to his relationship with PolyMax, his communications with PolyMax or its agents, his communications with Castile, or other potential claims that could be raised by PolyOne in litigation.

169.    Kutka willfully deleted hundreds of emails between himself, Lu, PolyMax, PolyMax Nantong and/or Castile, all in an effort to disrupt PolyOne's ability to prove its case in litigation.

170.    Kutka's willful destruction of evidence has disrupted PolyOne's ability to prove its case and PolyOne has suffered damages as a result of Kutka's destruction of evidence, including, without limitation, additional costs incurred by PolyOne in an effort to recover deleted files and attorneys' fees incurred by PolyOne as a result of Kutka's intentional destruction of documents.

171.    PolyOne is entitled to punitive damages and other sanctions as a result of the intentional spoliation of evidence by Kutka.

## **PRAYER FOR RELIEF**

Wherefore, PolyOne hereby requests that this Court enter a judgment in its favor and order:

A.  that a preliminary injunction be entered enjoining Kutka from continuing employment with PolyMax in any geographical area over which Kutka was assigned or  had responsibility while at PolyOne; *i.e.*, North America;

B.  that a preliminary and permanent injunction be entered enjoining further breaches or attempted breaches of the Agreement;

C.  that a preliminary and permanent injunction be entered enjoining the Defendants' use or disclosure of any of PolyOne's confidential or proprietary trade secret information, or information obtained in violation of the Computer Fraud and Abuse Act;

D.  specific performance by Kutka of the covenants contained in the Agreement concerning non-competition (including ¶¶ 4 and 5, attachment A and B and related provisions), such that the covenants begin to run from the date of entry by this Court of a permanent injunction;

E.  that Kutka preserve and return to PolyOne any and all property of PolyOne or anything containing the information of PolyOne, including, without limitation, any material relating to PolyOne formulations and technical information, business strategy, pricing, margins, costs, profitability, consultant reports, market reports, customer studies, and customer information;

F.  that judgment be entered for PolyOne against all defendants for any compensatory, statutory and related damages;

G.  that judgment be entered for PolyOne against Kutka requiring Kutka to forfeit any compensation paid to him during his period of disloyalty;

H.  that judgment be entered for PolyOne against all defendants for joint and several liability as a result of their conspiracy;

I.  that judgment be entered for PolyOne against all defendants for punitive damages;

J.  that PolyOne be awarded all of the costs and attorneys' fees it has incurred in connection with this action; and

K.  such other and further relief as this Court deems is just and proper.

Respectfully submitted,

*/s/ James D. Robenalt*
James D. Robenalt (0022165)
*Jim.Robenalt@ThompsonHine.com*
Matthew D. Ridings (0079402)
*Matt.Ridings@ThompsonHine.com*
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, Ohio 44114
Telephone:  (216) 566-5500
Fax:  (216) 566-5800

*Attorneys for Plaintiff PolyOne Corporation*

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby requests a trial by jury as to all issues so triable.

*/s/ James D. Robenalt*
James D. Robenalt
*An Attorney for Plaintiff PolyOne Corporation*

11781610